IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BARLEAN'S ORGANIC OILS, LLC,       )
                                    )
            Plaintiff,              )
                                    )
      v.                            )       1:22-CV-00555
                                    )
AMERICAN CULTIVATION &              )
EXTRACTION SERVICES, LLC, et        )
al.,                                )
                                    )
            Defendants.             )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

On July 15, 2022, Plaintiff Barlean's Organic Oils, LLC ("Barlean's") brought this action against American Cultivation & Extraction Services, LLC ("ACES") and several of its former partners, Ed Sartin, Charles Arthur Dick, and Cabell Poindexter, (collectively "Defendants"), seeking to recover damages for Defendants' alleged failure to honor a debt owed it. (Doc. 1.) In response to Barlean's complaint, Defendants filed an answer, along with a counterclaim alleging that Barlean's negligently misrepresented certain facts to induce them into executing the promissory note and guaranty made on the basis of Barlean's claims. (Doc. 7.) Barlean's filed a reply to the counterclaim (Doc. 10), and soon thereafter, the present motion for judgment on the pleadings, arguing that Defendants' counterclaim for negligent misrepresentation fails as a matter of law. (Docs. 12, 13.)

Defendants filed a response in opposition (Doc. 20), and Barlean's replied (Doc. 21). For the reasons set forth below, Barlean's motion for judgment on the pleadings will be denied.

## I. BACKGROUND

The court accepts as true the facts alleged in Defendants' counterclaim, which allege the following:

Barlean's is a Washington state limited liability company that manufactures and sells omega fatty acids, cannabidiol ("CBD"), and other dietary supplements. (Doc 1. ¶¶ 1, 11.) ACES, a now defunct North Carolina limited liability company (Doc. 7 countercl. ¶ 1), was in the business of hemp extraction and CBD oil manufacturing (Doc. 1 ¶ 12). In early 2019, ACES contacted Barlean's about establishing a business relationship whereby ACES would supply Barlean's with CBD oil. (Doc. 7 countercl. ¶ 6.) It also sent Barlean's a sample of its CBD "crude oil" - sometimes referred to as "full spectrum CBD oil" or "raw crude" (id. ¶ 7, 35) - so that Barlean's could determine whether ACES's product was suitable to its needs (id. ¶ 7). After Barlean's received the sample, Peter Nguyen, Barlean's Head of Research and Development, contacted John Barbee, ACES's then-Vice President of Sales and Marketing, to inquire further about ACES's hemp crop and extraction process. (Id. ¶ 8.)

Soon thereafter, Barlean's President and Chief Operating Officer, John Puckett, traveled to North Carolina to meet with

2

various ACES's officials, including Charles Dick and then-CEO Ken Kunberger. (Id. ¶ 9.) At that meeting, Puckett explained that Barlean's wanted to partner with ACES and had a "war chest of money" to do so. (Id.) Specifically, Puckett stated that Barlean's wanted ACES to supply it with "large quantities of CBD crude oil each month," which Barlean's would in turn use as an ingredient in its various commercial products. (Id. ¶ 12.) Before that could happen, however, Puckett indicated that ACES "would need to relocate" to a larger manufacturing facility that could be certified in compliance with good manufacturing practice ("GMP") regulations promulgated by the U.S. Food and Drug Administration. (Id. ¶ 8, 11.) Having anticipated this request, ACES's officials took Puckett to visit what they thought was a suitable facility, then available for lease, in Eden, North Carolina. (Id. ¶¶ 10-11.) Puckett, after visiting the Eden Facility, confirmed that it would be a "good location" both to "obtain the certifications that would be needed[,]" and to "handle Barlean's CBD purchases now and in the future." (Id. ¶ 11.) Puckett also explained that Barlean's would assist ACES in obtaining any certifications it needed to get the facility up and running. (Id.)

Puckett concluded the meeting by telling ACES's "principals that he was going to recommend that Barlean's invest in ACES's operation to make this happen." (Id.) Puckett explained that Barlean's ultimate vision for its partnership with ACES was

3

comprehensive: the end goal, Puckett "repeatedly" said, was for ACES to be Barlean's "primary supplier" of CBD crude oil, which meant that ACES would supply Barlean's with "approximately ninety percent (90%) of the CBD crude oil it was currently purchasing to service Barlean's existing customers, as well one hundred [percent] (100%) of CBD crude oil which would be needed to service new customer sales." (Id. ¶ 15.) Puckett also indicated that while ACES was likely a year away from becoming a "certified supplier for Barlean's" (meaning that ACES's facilities complied with GMP, among other requirements), that timetable could be drastically reduced with "the right funding and manpower." (Id. ¶ 13.) In Puckett's view, if all went as planned, Barlean's would "begin purchasing CBD crude oil from ACES during the first quarter of 2020." (Id.)

Following Puckett's visit and based on his assurances, ACES leased the Eden Facility. (Id. ¶ 16.) Around the same time, the parties began negotiating a deal in which Barlean's would fund the Eden Facility's upgrade, via a loan to ACES, which ACES would subsequently pay back through credit discounts on future purchase orders from Barlean's. (Id. ¶¶ 17, 21.) Specifically, the parties contemplated that Barlean's would loan ACES $500,000 to use for "the sole purpose of upfitting" the Eden Facility "to meet Barlean's production demands"; ACES, in turn, would repay the loan by providing Barlean's with a %5 discount (assuming a price of

4

$1,800 per liter of crude CBD oil) on each purchase for as long as the loan remained outstanding. (Id. ¶¶ 17, 21.) At this point, the only detail the parties had not agreed on was quantity; that is, how much CBD oil per month ACES would provide to Barlean's. Throughout the negotiations, however, Puckett "repeatedly represented" that Barlean's needed between 270 and 400 kilograms of crude CBD oil each month in the place of its current supplier. (Id. ¶¶ 23, 24.) Puckett also explained that if Barlean's procured new business from "any of the companies it was targeting," then ACES "would be the supplier of CBD crude oil for that business." (Id. ¶ 23.) During this time, the parties also agreed that, to speed up the process and ensure that the Eden facility conformed to Barlean's standards, Puckett would personally oversee the Eden Facility's upfit and design. (Id. ¶ 18.) To that end, Puckett visited the Eden Facility several times in the fall of 2019. (Id. ¶¶ 19, 20.) At no point during these visits did Puckett (or anyone else at Barlean's) ever suggest that Barlean's might instead need a blended CBD oil. (Id. ¶ 37.)

By December 2019, the parties had still not yet worked out the details of a supply agreement specifying how much CBD crude oil Barlean's would purchase from ACES per month. Nevertheless, they mutually agreed that, in the interest of time, they should move forward with a standalone promissory note and guarantee so that ACES had the funding to upfit the Eden Facility as soon as

5

possible. (Id. ¶¶ 28-29.) Accordingly, on December 12, 2019, ACES executed a promissory note in exchange for a $500,000 loan from Barlean's. (Id. ¶ 30; see Doc. 1-6.)[1] In relevant part, the promissory note reads:

> FOR VALUE RECEIVED, American Cultivation & Extraction Services, LLC, a North Carolina limited liability company (the "Maker") promises to pay to the order of Barlean's Organic Oils, LLC, a Washington State limited liability company (the "Holder") the principal sum of Five Hundred Thousand and 00/100 Dollars ($500,000.00) in accordance with the terms set forth in this promissory note (the "Note").
>
> 1. Sole <u>Purpose</u>. The amounts loaned to Maker pursuant to this Note shall be used by Maker solely for working capital costs incurred to up-fit the Maker's production facility located in Eden, North Carolina (the "Facility") such that the Facility becomes a Food and Drug Administration and GMP compliant extraction facility for CBD oil (the "Product"). Costs incurred to up-fit the Facility shall be inclusive of new equipment, raw materials and new hires associated with startup of the Facility.
>
> 2. <u>Payment</u>. Both principal and interest shall be payable in lawful money of the United States at the address of the Holder that is on record with Maker, or at such other place as the Holder may designate in writing and shall be subject to the following terms:
>
> > a. <u>Per the Terms of an executed CBD Supply Agreement</u>. If, within 120 days of the date hereof (the "Negotiation Period"), the parties hereto enter into a supply agreement where the Maker agrees to supply Holder with Product (the "CBD Supply Agreement"), then the terms of repayment of the Note by means of a credit discount will be as set forth in the CBD Supply

---

[1] Defendants Arthur Dick, Cabell Poindexter, and Ed Sartin (all ACES's principals) guaranteed the note. (See Doc. 1-7; Doc. 7 answer ¶ 17.)

> Agreement. No payments will be due during the Negotiation Period.
>
> b. <u>CBD Supply Agreement Terminated</u>. In the event the CBD Supply Agreement is subsequently terminated by either party while amounts remain outstanding pursuant to this Note, then the remaining amounts will be repaid in twenty-four (24) equal monthly payments beginning the month following the termination of the CBD Supply Agreement.
>
> c. <u>In the event no CBD Supply Agreement is executed</u>. If the Negotiation Period ends without the parties entering into the CBD Supply Agreement, then the Note shall be repaid in twenty-four (24) equal monthly payments beginning on May 1, 2020 . . . .

(Doc. 1-6 at 1 (emphasis original; some bold omitted).) As the terms make clear, a firm supply agreement was not incorporated into the promissory note; rather, the agreement plainly leaves open the possibility that no supply agreement would be reached at all by setting out three possible repayment plans: (1) per the terms of an executed supply agreement; (2) in the event that any supply agreement is terminated by either party; and (3) in the event that no supply agreement is executed at all.

About a month later, in January 2020, the parties finally came to terms on a supply agreement, albeit one that was carefully worded. Specifically, the parties executed a "Memo of Understanding," which states that ACES and Barlean's "intend to partner" together "in alignment" with various "principles" and "intend to work out the rest of the details in the normal course

7

of business." (Doc. 1-8 at 1.) One of the enumerated "principles" stated that ACES would "supply Barlean's with full-spectrum CBD oil (diluted) containing less than 0.3% THC and 5.4% CBD . . . at the agreed price of $1,800 FOB/kilo." (Id.) As noted, "full-spectrum" CBD oil is also known as "crude oil." (Doc. 7 countercl. ¶ 35.) Around the same time the parties executed the Memo of Understanding, ACES's officials spoke with Barlean's Head of Research and Development, Peter Nguyen, who confirmed with ACES that Barlean's needed a CBD crude oil that was slightly diluted with MCT oil. (Id. ¶ 33.)

In April 2020, Barlean's placed its first order with ACES for $81,709.80 of diluted full spectrum (i.e., crude) CBD oil - the type of oil contemplated in the parties' previous conversations (prior to entering into the promissory note) and the Memo of Understanding. (Id. ¶¶ 36, 39-40; Doc. 1 ¶ 22; Doc. 7 answer ¶ 22.) After receiving the order, however, Barlean's informed ACES that "the flavor panel" of the product "did not match Barlean's current blended distillate which it received from a different supplier." (Doc. 7 countercl. ¶ 41.) Apparently, what Barlean's actually needed from ACES was a "blended distillate," or more simply stated a "blended" CBD oil, a product distinct from a purely "full-spectrum" or crude CBD oil. (Id. ¶¶ 42, 45.) Barlean's also informed ACES that, contrary to its previous representations, it now only needed a fraction of the amount of

8

crude CBD oil it had repeatedly represented it needed;
specifically, Barlean's told ACES that it no longer needed at least
270-400 kilograms of CBD crude oil per month. (Id. ¶ 43.) In
response, ACES sought to solve the problem by providing Barlean's
with the blended product it now purportedly needed, but when it
inquired about the formulation required to "match the profile
requested," Barlean's demurred, simply responding that the
formulation was "proprietary" and thus that it could not provide
"exact ratios." (Id. ¶ 42.)

Barlean's and ACES did no further business together. (Doc.
1 ¶ 22; Doc. 7 answer ¶¶ 22, 23.) Nor did ACES make any remaining
payments on the promissory note.[2] On February 1, 2022, ACES
executed Articles of Dissolution. (Doc. 1 ¶ 23.)

Several months later, on July 15, 2022, Barlean's sued ACES
to recover on the unpaid promissory note. (Doc. 1 ¶¶ 26-37.) On
September 13, 2022, Defendants filed an answer, along with a
counterclaim alleging that they were improperly induced into
executing the promissory note due to negligent misrepresentations
made by Barlean's. (Doc. 7 countercl. ¶¶ 48-60.) On October 7,
2022, Barlean's filed a response (Doc. 10) and moved for judgment
on the pleadings, arguing that ACES's counterclaim fails as a

---

[2] In September 2020, Barlean's paid $77,624.31 ($81,709.80, less 5%) for
the first (and only) order of crude CBD oil and provided a $4,085.49
credit for the 5% difference against the outstanding balance on the
promissory note. (Doc. 1 ¶¶ 22, 28; Doc. 7 answer ¶ 22.) Since then,
ACES has made no payments on the note.

9

matter of law (Docs. 12, 13).  The motion is now fully briefed and ready for resolution.

## II.  ANALYSIS

### A.  Legal Standard

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The pleadings are "closed" after the complaint and answer are filed, along with any reply to additional claims (like a counterclaim) asserted in the answer.  See Fed. R. Civ. P. 7(a); 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1367 (3d ed. 2004).  A motion for judgment on the pleadings pursuant to Rule 12(c) is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6).  Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405-06 (4th Cir. 2002); see Conner v. Cleveland Cnty., N. Carolina, 22 F.4th 412, 420 (4th Cir. 2022).  Accordingly, when a court evaluates a motion for judgment on the pleadings, it must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]."  Massey v. Ojaniit, 759 F.3d 343, 347, 352-53 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015).  A pleading "must contain sufficient factual matter .

10

. . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible when the pleading contains "factual content that allows the court to draw the reasonable inference that [movant] is liable for the misconduct alleged." Id.

In applying this standard, the court must accept as true the facts alleged in the pleading and all reasonable inferences must be drawn in the non-movant's favor. Burbach, 278 F.3d at 405–06; Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). However, the court "need not accept the legal conclusions drawn from the facts." Spaulding v. Wells Fargo Bank, N.A., 714 F.3d 769, 776 (4th Cir. 2013) (quoting E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000)). "[L]egal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts," and a court does not consider "unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); see also Iqbal, 556 U.S. at 678 (explaining that mere legal conclusions are not accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" (alteration in original) (quoting Twombly, 550 U.S. at 555)). At

11

bottom, a motion for judgment on the pleadings is properly granted only if taking all of the non-moving party's factual allegations as true, no genuine issues of material fact remain, and the case can be determined as a matter of law.  Smith v. McDonald, 562 F. Supp. 829, 842 (M.D.N.C. 1983), aff'd, 737 F.2d 427 (4th Cir. 1984), aff'd, 472 U.S. 479 (1985).

In "determining a motion for judgment on the pleadings, the court may consider documents incorporated by reference in the pleadings" without converting the motion into one for summary judgment.  Farmer v. Wilson Hous. Auth., 393 F. Supp. 2d 384, 386 (E.D.N.C. 2004) (internal quotation marks omitted) (quoting Parks v. Alteon, Inc., 161 F. Supp. 2d 645, 649 n.1 (M.D.N.C. 2001)). However, documents attached to the answer are part of the pleadings for Rule 12(c) purposes only if the documents are integral to the pleading and authentic.  See Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 164 (4th Cir. 2016); Pulte Home Corp. v. Montgomery Cnty., MD, 909 F.3d 685, 691, 693-94 (4th Cir. 2018) (applying Goines in the 12(c) context).  A document is considered integral to the pleading where the complaint relies heavily upon its terms and effect, or the document has an independent legal significance to the claim.  See Goines, 822 F.3d at 166.  "When the plaintiff . . . incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document," the court may credit the document

12

over conflicting allegations in the complaint.  <u>Id.</u> at 167.
However, it is inappropriate to treat the contents of a document
as true where the plaintiff incorporates the document for purposes
other than its truthfulness.  <u>Id.</u>  "The purpose for which the
document is offered is particularly important where the document
is one prepared by or for the defendant."  <u>Id.</u> at 168.

The parties agree that Defendants' counterclaim arises under
North Carolina law.  (<u>See</u> Doc. 13 at 5 n.1; Doc. 20 at 10-18.)
Accordingly, this court must predict how the Supreme Court of North
Carolina would rule on any disputed state law issues.  <u>See</u> <u>Twin</u>
<u>City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.</u>, 433
F.3d 365, 369 (4th Cir. 2005).  In doing so, the court must look
first to opinions of the Supreme Court of North Carolina.  <u>See</u>
<u>id.</u>; <u>Parkway 1046, LLC v. U.S. Home Corp.</u>, 961 F.3d 301, 306 (4th
Cir. 2020).  If there are no governing opinions from the Supreme
Court of North Carolina, the court may consider the opinions of
the North Carolina Court of Appeals, treatises, and "the practices
of other states."  <u>Twin City Fire Ins. Co.</u>, 433 F.3d at 369
(internal quotation marks and citation omitted).  In predicting
how the highest court of a state would address an issue, the court
must "follow the decision of an intermediate state appellate court
unless there is persuasive data that the highest court would decide
differently."  <u>Town of Nags Head v. Toloczko</u>, 728 F.3d 391, 398
(4th Cir. 2013) (internal quotation marks omitted); <u>see</u> <u>Hicks v.</u>

Case 1:22-cv-00555-TDS-JLW   Document 28   Filed 05/26/23   Page 13 of 26

<u>Feiock</u>, 485 U.S. 624, 630 & n.3 (1988).  Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy."  <u>Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.</u>, 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); <u>see Day & Zimmermann, Inc. v. Challoner</u>, 423 U.S. 3, 4 (1975) (per curiam); <u>Wade v. Danek Med., Inc.</u>, 182 F.3d 281, 286 (4th Cir. 1999).

    **B.  Negligent Misrepresentation**

    Defendants' sole counterclaim alleges that Barlean's, mainly through its Chief Operating Officer and President John Puckett, negligently misrepresented the "quantities of CBD crude oil it needed" each month (specifically that "it would require about 270-400 kilos of pure, crude CBD oil per month to meet their product's needs"), and in doing so induced ACES "to accept the loan, enter the Promissory Note and Guarantee, and upfit the Eden Facility to the certifications and capacity Barlean's required."  (Doc. 7 countercl. ¶¶ 46, 50, 52.)  In its motion for judgment on the pleadings, Barlean's argues that Defendants' counterclaim fails as a matter of law for three independent reasons: first, that the counterclaim "demonstrate[s] a lack of justifiable reliance," because the promissory note "specifically disclaims any purchase amount guarantee or even the existence of future purchases at all" (Doc. 13 at 6);  second, that Defendants have failed to show that

14

"their reliance on alleged future purchase amounts was detrimental" (id. at 7); and third, that even assuming Barlean's made a misrepresentation, Defendants have failed to allege that Barlean's owed them, or breached, any duty of care (id. at 8-10).

In response, Defendants counter each of Barlean's arguments. First, Defendants contend they have adequately pleaded justifiable reliance, emphasizing that "the misrepresentations [they allege] are not that Plaintiff guaranteed a certain quantity of CBD crude oil that it would definitively buy from ACES in the future, but rather that it misrepresented what *its needs actually were in the first place*." (Doc. 20 at 13-14 (emphasis in original).) Accordingly, Defendants say, the misrepresentations are not "directly contrary" to the promissory note's terms, thus allowing their allegation of justifiable reliance to survive at this stage. (Id.) Second, Defendants contend they have sufficiently alleged detrimental reliance because ACES "undertook the upfit at substantial expense[,]" an investment they would not have made in the absence of Barlean's representations. (Id. at 14-15.) And third, Defendants argue that Barlean's "owed [them] a duty of care separate and apart from a contractual relationship to make a full and fair disclosure as to the product it actually needed from ACES." (Id. at 16 (internal quotation marks omitted).)

Under North Carolina law, the tort of negligent misrepresentation occurs when a party (1) justifiably relies (2)

15

to its detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care. See Raritan River Steel Co. v. Cherry, Bekaert & Holland, 367 S.E.2d 609, 612 (N.C. 1988); Brinkman v. Barrett Kays & Assocs., P.A., 575 S.E.2d 40, 44 (N.C. Ct. App. 2003); Fitzgerald Fruit Farms LLC v. Aseptia, Inc., 527 F. Supp. 3d 790, 799 (E.D.N.C. 2019), aff'd sub nom. Fitzgerald Fruit Farms, LLC v. Harris, 858 F. App'x 625 (4th Cir. 2021) (unpublished). "In a negligent-misrepresentation claim, the 'question of justifiable reliance is analogous to that of reasonable reliance in fraud actions.'" Jackson v. Minnesota Life Ins. Co., 275 F. Supp. 3d 712, 732 (E.D.N.C. 2017) (quoting Marcus Bros. Textiles Inc. v. Price Waterhouse, LLP, 513 S.E.2d 320, 327 (N.C. 1999)); see Breeden v. Richmond Cmty. Coll., 171 F.R.D. 189, 202, n.15 (M.D.N.C. 1997) ("The tort of negligent misrepresentation in North Carolina is primarily a fraud-based claim.") "Whether a party's reliance is justified is generally a question for the jury, except in instances in which 'the facts are so clear as to permit only one conclusion.'" Dallaire v. Bank of Am., N.A., 760 S.E.2d 263, 267 (N.C. 2014) (quoting Marcus Bros. Textiles, 513 S.E.2d 320); see also Jackson, 275 F. Supp. 3d at 732. The facts only permit one conclusion (among other occasions) when a party alleges misrepresentations "that are directly contrary to the express terms of a written contract." Abbington SPE, LLC v. U.S. Bank, Nat'l Ass'n, 352 F. Supp. 3d 508, 518

16

(E.D.N.C. 2016) (internal quotation marks omitted) (collecting cases), aff'd, 698 F. App'x 750 (4th Cir. 2017). In this circumstance, reliance on such misrepresentations is unreasonable as a matter of law. Id. (citing cases); see Jackson, F. Supp. 3d at 732; Guhne v. Ceridian HCM, Inc., No. 1:20-CV-925, 2021 WL 1165328, at *10 (M.D.N.C. Mar. 26, 2021). This principle comports with the "duty to act with reasonable prudence for [one's] own safety." Davis v. Davis, 124 S.E.2d 130, 133 (1962). "One who signs a written contract without reading it, when he can do so understandingly, is bound thereby unless the failure to read is justified by some special circumstance." Id.[3]

The first argument by Barlean's – that Defendants did not justifiably rely on the alleged misrepresentation – fails at the present stage. On this point, the parties spar primarily over whether the alleged misrepresentation is "directly contrary" to the promissory note.

As stated above, the promissory note plainly implies that Barlean's was under no obligation to purchase CBD crude oil from ACES; indeed, by its very terms, the parties contemplated a specific loan repayment plan "[i]n the event no CBD Supply Agreement is executed." (Doc. 1-6 at 1 (emphasis added).)

---

[3] Claims of negligent misrepresentation also fall within the purview of Federal Rule of Civil Procedure 9(b). See Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 117 F. Supp. 3d 722, 727 (M.D.N.C. 2015) (collecting cases). Barlean's does not contend that Defendants have failed to meet this standard.

Accordingly, Barlean's is correct to the extent it contends that Defendants unreasonably relied on its alleged promise to purchase a certain quantity of CBD crude oil <u>from ACES</u> in the future. (<u>See</u> Doc. 13 at 6 (arguing that "reliance on future CBD purchase amounts is unreasonable as a matter of law when, as here, the Note itself specifically disclaims any purchase amount guarantee or even the existence of future purchases at all").)

Yet, as the pleading makes clear, Defendants' primary allegation is that Barlean's misrepresented <u>the type</u> of CBD oil it (Barlean's) "actually needed (a distillate blend instead of crude oil) and the quantity of oil it actually used in servicing its customers" (Doc. 20 at 14), <u>not</u> that Barlean's misrepresented the quantity of CBD oil that it would actually purchase from ACES in the future. (<u>See</u> Doc. 7 countercl. ¶ 50 ("Specifically, Barlean's represented that it would require about 270-400 kilos of pure, crude CBD oil per month to meet their product's needs. This representation was false.").)[4]  Recall that according to Defendants' allegations, which the court accepts as true at this stage, Barlean's (mainly through John Puckett) repeatedly

---

[4] Put differently, Defendants allege that Barlean's misrepresented <u>its own needs</u>, not that it misrepresented what it would definitively buy from ACES in the future. (<u>See</u> Doc. 20 at 13 ("The facts as pled establish that Plaintiff repeatedly represented that it needed a certain type of CBD oil that it did not actually need and a quantity of CBD crude oil that it did not actually need and that those representations were relied upon by Defendants in making the decision to move forward in ACES's partnership with Plaintiff.").)

18

represented to ACES that it needed "crude CBD oil in quantities of 270 to 400 kilograms per month." (Doc. 7 countercl. ¶ 24 (emphasis added).) Yet after ACES executed the promissory note, leased the Eden Facility, and spent additional capital upfitting the facility, Barlean's shifted course; what it then needed, apparently, was a "blended CBD oil product," not "the CBD crude oil it had [previously] indicated that it needed." (Id. ¶ 37 (emphasis added).) Not only that, but Barlean's needed a blended oil with a specific flavor profile, the formulation of which was "proprietary" and thus not possible for ACES to replicate. (Id. ¶ 42.) Barlean's also told ACES that, notwithstanding its prior representations about quantity, "it would only be requiring a small fraction of the amount of crude CBD oil it had repeatedly represented it needed[.]" (Id. ¶ 43.)

As Defendants explain, had they been given this information about Barlean's needs upfront (namely that it needed a blended oil, not a crude oil), they would never have agreed to either the lease or the promissory note, nor would they have spent "additional capital" upfitting the Eden Facility. (Id. ¶ 46 ("If ACES and its principals had known that Barlean's had misrepresented the quantities of CBD crude oil it needed then ACES would not have leased the Eden facility building.").) Or, at the very least, Defendants say, they "would have been able to make an informed decision as to whether to move forward with executing the

19

Promissory Note and undertaking the upfit." (Doc. 20 at 14.) In Defendants' words, "[t]he reduced quantities of CBD crude oil [that Barlean's] actually needed for [a] blended product . . . would have never financially justified the expense of the Eden Facility lease and upfit costs." (Doc. 7 countercl. ¶ 46.) And it makes no difference, Defendants conclude, whether Barlean's actually pledged to purchase the CBD crude oil from them specifically; rather, the key point is that had they known that Barlean's needed a "blended oil," they would not have done the deal because, regardless of their status as a supplier, ACES "could not make [the blended oil] without information from Barlean's or its existing supplier." (Id. ¶ 47.)

Framed in this way, the facts are not "so clear as to permit only one conclusion." Marcus Bros. Textiles, 513 S.E.2d 320 (citation omitted). Crucially, the representation about the type and quantity of CBD oil that Barlean's needed is not directly contrary to anything set out on the promissory note. To be sure, the promissory note plainly indicates that Barlean's may or may not purchase CBD oil from ACES in the future; but it says nothing about the type and quantity of CBD oil that Barlean's itself needed. Indeed, Barlean's concedes as much in its reply brief. (See Doc. 21 at 4 (noting that "the Note does not expressly address the type and quantity of product that Barlean's needed"). Notably, and in contrast to Guhne, on which Barlean's relies, there is no

20

merger clause in the promissory note that explicitly supersedes or negates the impact of earlier representations or discussions. See Guhne, 2021 WL 1165328 at *10. Accordingly, the alleged misrepresentation regarding Barlean's needs is not directly contrary to the promissory note, and it cannot be said, at least at this very preliminary stage, that reliance on that representation would be unreasonable as a matter of law.

In response to all of this, Barlean's argues that Defendants' alleged misrepresentation presents a "distinction without a difference." (Doc. 21 at 4 n.4). The bottom line, it says, is that even assuming Barlean's made certain representations about its own needs, "Defendants could not have justifiably relied on such representations while it was clear that Barlean's had no obligation to buy anything from ACES." (Id. at 2.) To a certain extent, Barlean's point is well-taken; indeed, it seems in all likelihood that ACES entered into the deal under the impression that it would be Barlean's sole supplier of CBD oil going forward. And doubtlessly, this impression was legally vitiated by the plain terms of the promissory note. See Abbington, 352 F. Supp. 3d at 518-519. But at this stage of the litigation, Defendants have plausibly alleged that what they relied on was the specific representation that what Barlean's needed – whether from ACES or any other supplier - was crude CBD oil, not blended CBD oil. And with respect to that misrepresentation, Defendants have pleaded

21

enough to make it plausible that they would not have done the deal had Barlean's provided them with accurate information. Whether this claim is true – namely, whether ACES's reliance was in fact reasonable - is not suitable for resolution at the present stage. See Olivetti Corp. v. Ames Bus. Sys., Inc., 356 S.E.2d 578, 584 (N.C. 1987) ("Ordinarily, the question of whether an actor is reasonable in relying on the representations of another is a matter for the finder of fact."); State Properties, LLC v. Ray, 574 S.E.2d 180, 186 (N.C. Ct. App. 2002) ("The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." (citation omitted)); Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 449 (S.D.N.Y. 2010) ("[T]he element of reasonable reliance ordinarily is a fact-intensive issue not proper for determination as a matter of law at the pleading stage, but one more appropriate for the fact-finder after discovery has developed a sufficient evidentiary record."); Restatement (Second) of Torts § 552 (Am. L. Inst. 1977) ("What is reasonable is, as in other cases of negligence, dependent upon the circumstances[,]" and thus "[t]he question is one for the jury, unless the facts are so clear as to permit only one conclusion."). Put another way, a reasonable jury could find that while the risk that Barlean's was not contractually obligated to buy anything from ACES was known and could be assessed by Defendants, the fact that Barlean's allegedly had absolutely no

interest in the product to be made by ACES (in the very facility that was the sole purpose of the upfit loan) was material, not disclosed, and one on which Defendants reasonably relied in assessing its risk in undertaking the loan.

The second argument raised by Barlean's – that ACES's reliance was not to its detriment – also fails. The facts as alleged clearly render it plausible that, but for the representations by Barlean's, ACES would not have leased the Eden Facility, or spent additional capital upfitting the facility. (See Doc. 7 countercls. ¶ 45 (alleging that "the lease and the promissory note would never have been entered and the additional capital would not have been spent but for the reasonable reliance of ACES on the misrepresentations of Barlean's of the CBD crude oil and quantities it needed"); Doc. 20 at 15 ("ACES did not need the expanded capacity or the same certifications to service its other customers.").) This allegation is sufficient at this stage to show that Defendants relied on the representation to their detriment. See T.W.T. Distrib., Inc. v. Johnson Prod. Co., 966 F. Supp. 2d 576, 581–82 (W.D.N.C. 2013) (concluding that plaintiff's entering a lease it otherwise would not have was sufficient to show detrimental reliance); Angell v. Kelly, 336 F. Supp. 2d 540, 549 (M.D.N.C. 2004) ("Plaintiffs have . . . alleged that they justifiably relied on these representations and did so to their detriment, since execution of the Release Agreement allowed

23

Premiere to go forward with its merger, eventually leading to its bankruptcy.")

The final point of disagreement between the parties is whether Barlean's owed Defendants a duty of care. (Compare Doc. 13 at 8-10 with Doc. 20 at 15-18.) Under North Carolina law, a "duty of care may arise between adversaries in a commercial transaction" if one party to the transaction had exclusive access to or control of the information at issue, and the other party "had no ability to perform any independent investigation." Rountree v. Chowan Cty., 796 S.E.2d 827, 832 (N.C. Ct. App. 2017) (quoting Kindred of N.C., Inc. v. Bond, 584 S.E.2d 846, 853 (N.C. Ct. App. 2003)); see also Beach Mart, Inc. v. L&L Wings, Inc., 784 F. App'x 118, 126 (4th Cir. 2019) (unpublished) (remanding to the district court to consider "whether the exception to the general rule regarding disclosure of information in commercial transactions, namely, when one party controls the relevant information, was applicable");[5] Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc., No. 109CV00018, 2010 WL 3943754, at *2 (M.D.N.C. Oct. 7, 2010) ("Under North Carolina law, a party to a contract owes the other contracting party a separate and distinct duty not to provide false information to induce the execution of the contract." (citing Bond,

---

[5] While the Fourth Circuit does not ordinarily accord precedential value to its unpublished opinions, it has noted that they "are entitled only to the weight they generate by the persuasiveness of their reasoning." Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (citation omitted).

584 S.E. 2d at 853)).

Applying that principle here, the court finds that Defendants have plausibly alleged that Barlean's owed them a duty of care and that it breached that duty by negligently misrepresenting the type and quantity of CBD oil it needed.[6] Viewed in the light most favorable to Defendants, the facts as alleged are sufficient to establish that Barlean's, without exercising reasonable care, provided Defendants with what was ultimately false information regarding the type and quantity of crude CBD oil it would need in the future. Because that information was exclusively accessible to, and in control of, Barlean's, it had a legal duty to provide Defendants with "accurate, or at least negligence-free" information. Compare Rountree, 796 S.E.2d at 832 (concluding that plaintiff owed defendant no duty of care because defendant "did not have exclusive access or control over the [relevant] information, which was publicly available and readily accessible") with Bond, 584 S.E.2d at 853 (concluding that the seller of a company had a duty "to provide accurate, or at least negligence-free financial information" about the company because she "was the

---

[6] Barlean's does not directly contest the third element of a negligent misrepresentation claim: that the relevant information was "prepared without reasonable care." Raritan River, 367 S.E.2d at 612. Instead, Barlean's sole argument here is that it owed Defendants no duty in the first place. (See Doc. 13 at 9-10.) Accordingly, the court will treat the third element as plausibly alleged. See City of High Point, N. Carolina v. Suez Treatment Sols. Inc., No. 1:19CV540, 2020 WL 1307017, at *10 (M.D.N.C. Mar. 19, 2020).

25

only party who had or controlled the information at issue" and the buyer "had no ability to perform any independent investigation"). Furthermore, "[a]t this preliminary stage, it is not clear from the facts alleged" that Defendants "could have discovered the truth about the alleged misrepresentation upon reasonable inquiry." Vinson v. Int'l Bus. Machs. Corp., No. 1:17-cv-00798, 2018 WL 4608250, at *10 (M.D.N.C. Sept. 25, 2018). Indeed, it is plausible that Defendants had no reason inquire further at all, given Barlean's "repeated[]" and frequent representations about its needs. (Doc. 7 countercl. ¶¶ 43-44.)[7]

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the motion for judgment on the pleadings by Defendant Barlean's (Doc. 12) is DENIED.

/s/    Thomas D. Schroeder
United States District Judge

May 26, 2023

---

[7] The court limits this holding to representations made prior to the execution of the promissory note. To the extent Barlean's made misrepresentations after the promissory note was entered into, Defendants' remedy lies in contract, as Defendants "at that point had already been 'induced' into entering into the [agreement]." City of High Point, 2020 WL 1307017 at *11.

26