IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BARLEAN'S ORGANIC OILS, LLC,        )
                                    )
                Plaintiff,          )
                                    )
v.                                  )
                                    )
AMERICAN CULTIVATION &              )
EXTRACTION SERVICE, LLC, ED         )
SARTIN, ARTHUR DICK, and            )
CABELL POINDEXTER,                  )
                                    )
                Defendants,         )
                                    )        1:22-CV-555
AMERICAN CULTIVATION &              )
EXTRACTION SERVICES, LLC, ED        )
SARTIN, ARTHUR DICK, and            )
CABELL POINDEXTER,                  )
                                    )
                Counterclaim-       )
                Plaintiffs,         )
                                    )
        v.                          )
                                    )
BARLEAN'S ORGANIC OILS, LLC,        )
                                    )
                Counterclaim-       )
                Defendant.          )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

        This is a contract dispute over a loan agreement and guaranty
between former business partners in the cannabidiol ("CBD")
industry.  After a four-day trial beginning on February 12, 2024,
the jury returned a verdict in favor of Defendant American
Cultivation and Extraction Services, Limited Liability Company
("ACES"), on its affirmative defense of mutual mistake of fact,

and on its counterclaim for negligent misrepresentation. (Doc. 66.) The jury awarded ACES one dollar for the negligent misrepresentation counterclaim (id.), and the parties agreed to reserve for the court resolution of the appropriate equitable remedy in light of the jury's mutual mistake finding — namely, whether a restitution judgment should be entered and, if so, against which Defendant(s).

Before the court is the renewed motion of Plaintiff Barlean's Organic Oils, Limited Liability Company ("Barlean's") for judgment as a matter of law and the parties' briefing on post-trial remedies. (Docs. 71, 72, 73, 74.) For the reasons set forth below, Barlean's motion will be denied, and judgment will be entered in accordance with this memorandum opinion and order.

## I. BACKGROUND

Barlean's is a Washington-based manufacturer and seller of various organic products, including CBD oil. ACES, a now-dissolved North Carolina company, was in the business of hemp extraction and CBD oil manufacturing. Defendants Ed Sartin, Arthur Dick, and Cabell Poindexter are residents of North Carolina and were the founding members of ACES.

In 2019, based on a prior business relationship between Barlean's Chief Executive Officer John Puckett and ACES Vice President of Sales and Marketing John Barbee, the parties began discussing the establishment of a business relationship whereby

2

ACES would supply Barlean's with CBD oil for use in its products. (Trial transcript ("Tr.") 181:9-20, 183:3-20.) According to Defendants, over the course of these discussions through 2019 and early 2020, Barlean's representatives made what it later determined were false material representations regarding both the type and the quantity of CBD oil it needed ACES to supply. (Doc. 7 at 8.) Specifically, as Defendants have argued, Barlean's represented to them during these discussions that it currently required "crude" CBD oil, rather than a more refined product, and ten times more in volume than Barlean's actually needed.

While ACES had a facility from which it produced CBD oil, Puckett informed it that in order to become Barlean's supplier, ACES needed to upfit a new facility to comply with the federal Food and Drug Administration's current Good Manufacturing Practices ("cGMP") regulations. (Tr. 196:4-7.) ACES was unable to fund this upfit alone, so on December 12, 2019, Barlean's and ACES agreed to a promissory note, and Barlean's and Sartin, Dick, and Poindexter (the "Guarantors") executed a guaranty agreement for the note. (Plaintiff Exhibit ("PX") 9, 10.)[1] The principal terms of the promissory note are as follows:

1.    Barlean's agreed to loan ACES $500,000 for the upfit.

2.    ACES agreed to repay Barlean's the principal of $500,000

---

[1] Defendants alleged that ACES spent $124,450.89 above the $500,000 loan to complete the upfit of the facility. (Tr. 623:1-2.)

3

through three possible options:

a. If a "CBD Supply Agreement" between Barlean's and ACES is executed within 120 days of the execution of the note, the note would be repaid by means of a credit discount to be determined in the CBD Supply Agreement.

b. If a CBD Supply Agreement is subsequently terminated by either party, any remaining balance would be repaid in twenty-four equal monthly payments beginning the month after termination.

c. If no CBD Supply Agreement is executed within 120 days of the execution of the promissory note, the balance would be repaid in twenty-four equal monthly payments beginning on May 1, 2020.

3. In the event payment is not made in full within fifteen days of any due date, the promissory note would be in default. Barlean's may, in such instance, declare the entire amount due and payable, and interest would accrue at a rate of five percent per annum, compounded monthly.

(PX 9.) The terms of the guaranty agreement are in relevant part as follows:

1. The Guarantors make an "unconditional guaranty of payment and not of collection" that applies to the "obligations of Debtor [ACES] to Lender [Barlean's]

4

arising under the Note."

2. The Guarantors "expressly waive all legal and equitable defenses to the enforcement of th[e] Guaranty, including any such defenses alleging unenforceability of any CBD Supply Agreement."

(PX 10.)

The parties dispute whether they ever entered into a CBD Supply Agreement. They agreed they reached a "Memo of Understanding" on January 29, 2020, that appears to enumerate some supply terms (PX 14), but they disputed whether this document constituted the CBD Supply Agreement contemplated by the promissory note.[2]

Puckett oversaw the upfit in North Carolina. (Tr. 106:20-23.) As discussed in more detail below, following completion of the upfit, the parties met at Barlean's office in Washington State in February 2020. During that meeting, it became apparent that Barlean's was not in fact receiving, and thus did not require, 200 liters per month of CBD oil from its current supplier, as it had told Defendants, but rather only 23 liters. (Tr. 201:8-20, 360:9-361:19.)

The parties nevertheless continued to move forward, as ACES

---

[2] The jury would have been asked to consider this issue in the event it found a breach of contract. (Doc. 66.) The issue is now moot.

had already completed the upfit. In the end, however, ACES sent just one shipment of CBD oil to Barlean's, dated April 28, 2020. (PX 21.) For this shipment, ACES credited Barlean's five percent of the purchase price — i.e., $4,085.49 of $81,709.80 — as an apparent payment on the promissory note. (Id.) Barlean's raised complaints about the taste of the CBD oil, and the parties' efforts to resolve those issues ultimately revealed to ACES by July 2020 that the product Barlean's was receiving from its supplier (which ACES was to replace) was much closer to a finished product than the "crude" oil Puckett had represented to ACES that Barlean's required. (Defense Exhibit ("DX") 13, 15.) Barlean's was also unable to share the recipe for the proprietary blend of CBD oil it was receiving from its supplier. (PX 18; Tr. 206:16-25.) Despite efforts to revive the arrangement over the intervening months, nothing came of it. (See PX 22 through 25.) ACES was unable to pay the amount due under the promissory note and filed its articles of dissolution with the North Carolina Secretary of State on February 1, 2022. (Doc. 1-9.) Barlean's issued a demand letter for repayment of the note on April 19, 2022. (Doc. 1 ¶ 25 (admitted by Defendants, Doc. 7); Doc. 1-10.) ACES made no further payments. (Doc. 1 ¶ 24 (admitted by Defendants, Doc. 7).) Barlean's filed this action on July 15, 2022.

Barlean's sued ACES for breach of the promissory note (first cause of action) and the Guarantors for breach of the guaranty

agreement (second cause of action). (Doc. 1.) It sought $500,000, plus prejudgment interest, costs, and attorney's fees, minus a $4,085.49 credit. (Id. at 7.) Defendants pleaded the affirmative defense of mutual mistake of fact, alleging that the parties entered into the promissory note and guaranty agreement due to a mutual mistake as to both the type and quantity of CBD oil Barlean's represented it required. (Doc. 7 at 7.) Defendants also counterclaimed for negligent misrepresentation for $124,450.89, which was the money they contributed beyond the note amount to accomplish the upfit. (Doc. 7 at 18.)

At trial, the court granted Barlean's request not to submit to the jury Defendants' mutual mistake defense as to the guaranty agreement because it contains an express waiver of "all legal and equitable defenses." (PX 10; Tr. 552:24-553:11.) Accordingly, while ACES faced breach of contract allegations for the promissory note and the Guarantors faced breach of contract allegations for the guaranty agreement, only ACES raised the mutual mistake defense and only as to the promissory note. (Doc. 66.)[3] On this

---

[3] As to the verdict form, the parties disputed whether to have the jury answer the mutual mistake question before answering whether a breach of contract occurred. The court adopted Defendants' position, which accords with the North Carolina Pattern Instruction's treatment of mutual mistake as an issue of contract formation to be considered before finding whether a breach occurred. See N.C. Pattern Instruction 501.30. Upon the court's resolving the order of the issues, the parties agreed not to submit to the jury any questions about the Guarantors' liability for breach of contract in the event the jury found mutual mistake as to the promissory note. This was sensible to simplify the verdict form because

7

affirmative defense, the jury was instructed (as all parties proposed) that ACES bore the burden of showing, *inter alia*, that it "signed the Promissory Note while mistakenly believing that (1) Plaintiff required approximately 10 times the volume of CBD compared to that which Plaintiff actually required; and/or (2) Plaintiff required a CBD crude oil blended only with MCT oil as opposed to a proprietary CBD oil distillate." (Doc. 64 at 7-8; Doc. 48-1 at 22; Doc. 50 at 16.) The jury found in favor of ACES on its defense of mutual mistake. (Doc. 66.)

ACES alone raised a counterclaim for negligent misrepresentation, as Defendants conceded at trial that there was no evidence to support that the Guarantors were damaged by any negligent misrepresentation. (Tr. 495:21-23.) The jury found for ACES on its negligent misrepresentation claim and awarded one dollar. (Doc. 66.)

At the close of Defendants' evidence, Barlean's moved for judgment as a matter of law and argued that the mutual mistake defense is "not viable" because it would only "provide opportunity for rescission, which Defendants are not offering to do, and ACES, in particular, is not even in a position to do." (Tr. 440:24-

---

the parties stipulated that the Guarantors had not paid any amount to Barlean's on the guaranty agreement. (Tr. 592:13-16.) Instead, the parties agreed that any liability of the Guarantors would be decided by the court in equity if the jury found mutual mistake. Without objection by any party (Tr. 590:2-7), the jury was thus never asked to make any findings as to Barlean's second claim for relief against the Guarantors.

447:3.) In other words, Barlean's contended that unless ACES was in a position to return the $500,000 loaned to it, rescission was unavailable. (Id.) The court reserved ruling. (Tr. 450:8-9.) Barlean's renewed its motion following its rebuttal case, and the court again reserved ruling. (Tr. 546:3-4.) After the jury delivered its verdict finding mutual mistake, Barlean's renewed its motion, and the court again reserved and directed the parties to file post-trial briefs on the appropriate remedy in light of the jury's verdict. (Tr. 669:25-670:1.)[4]

Barlean's has filed a brief in support of its Rule 50 motion (Doc. 71), and Defendants have responded in opposition (Doc. 74). The parties have also filed supplemental briefing on the equitable remedy, if any, the court should enter as to the promissory note in light of the jury's mutual mistake finding. (Docs. 72, 73; Tr. 670:4-19.) Barlean's motion and the post-trial remedies issues have been fully briefed and are ready for resolution.

## II. ANALYSIS

### A. Rule 50 Motion

#### 1. Standard of Review

"To challenge the sufficiency of the evidence in a civil jury trial . . . a party must comply with Federal Rule of Civil Procedure 50," which "sets out two different stages for such a

---

[4] Defendants had moved for judgment as a matter of law but conceded that it was moot in light of the jury's verdict. (Tr. 669:12-20.)

challenge." Belk, Inc. v. Meyer Corp., 679 F.3d 146, 154 (4th Cir. 2012). Rule 50(a) "allows a party to challenge the sufficiency of the evidence before a case is submitted to the jury," whereas Rule 50(b) "sets forth the requirements for challenging the sufficiency of the evidence after the jury verdict and entry of judgment." Id. at 155. Judgment as a matter of law is appropriate where a party has been fully heard on an issue but has failed to produce sufficient evidence for a reasonable jury to find for it. Fed. R. Civ. P. 50(a)-(b); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000). The standard for judgment as a matter of law mirrors the standard for granting summary judgment "such that 'the inquiry under each is the same.'" Reeves, 530 U.S. at 150 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)); see Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002) ("A Rule 50(b) motion for judgment as a matter of law follows the same standard as a Rule 56 motion for summary judgment.").

A motion under Rule 50(b) "tests the legal sufficiency of a claim, that is, assesses whether the claim should succeed or fail because the evidence developed at trial was insufficient as a matter of law to sustain the claim." Belk, Inc., 679 F.3d at 155. The court is to "review the record as a whole" but "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 151. All reasonable

10

inferences must be drawn in favor of the nonmoving party, and the court is not permitted to make credibility determinations or weigh the evidence.  Id. at 150.  The limited review of the evidence is required by "the importance of the jury's role in trials . . . enshrined in the Seventh Amendment."  Burgess v. Goldstein, 997 F.3d 541, 554 (4th Cir. 2021).

### 2. Barlean's Rule 50 Motion

Barlean's argues that the mutual mistake defense is "not viable" because it would only "provide opportunity for rescission, which Defendants are not offering to do, and ACES, in particular, is not even in a position to do." (Tr. 440:24-441:3; see also id. 441:10-12 ("[T]he issue of mutual mistake should not be something that needs to go to the jury under these circumstances.").)  In its post-trial brief, Barlean's reiterated its argument at trial — namely, that the inability of ACES to repay the loan invalidates its defense and should prevent ACES from claiming that the promissory note is void.  (Doc. 71 at 3-4.)

As ACES argues, Barlean's position — that the mutual mistake defense is not "viable" because, in its view, rescission cannot be effectuated — is without factual or legal support.  As to factual sufficiency, Barlean's has not even argued that there was legally insufficient evidence to support a finding of mutual mistake of fact.  This ground accordingly cannot provide a basis for granting Barlean's motion.  Fed. R. Civ. P. 50(b) (requiring that movant

specify legal and factual grounds for motion).  Even if Barlean's
had raised this argument, the evidence at trial, outlined below,
more than suffices to deny the motion.  <u>Belk, Inc.</u>, 679 F.3d at
154.

Instead, Barlean's argues that the inability of ACES to
rescind the promissory note should prevent, as a matter of law, a
finding of mutual mistake of fact.  <u>See</u> <u>Dupree v. Younger</u>, 598
U.S. 729, 736-37 (2023) (observing that a purely legal question
"[m]aybe" can be raised on a Rule 50 motion but stating that "there
is no benefit to having a district court reexamine a purely legal
issue after trial").  Barlean's has never cited, and this court
has not found, a single North Carolina case (or any authority for
that matter) to support the proposition that the inability to
effectuate rescission is a ground not to submit the issue of mutual
mistake to the jury.  Barlean's cases, discussed in more detail
<u>infra</u>, have instead addressed the scope of the court's <u>equitable</u>
authority to fashion a remedy upon a finding of mutual mistake of
fact.  <u>See, e.g.,</u> <u>May v. Loomis</u>, 52 S.E. 728 (N.C. 1905)
(discussing equitable remedy where buyer of timberland alleged
mutual mistake of fact as to a real property transaction); <u>Lumsden</u>
<u>v. Lawing</u>, 451 S.E.2d 659 (N.C. Ct. App. 1995) (discussing
equitable remedy of monetary restitution where real property had
been conveyed to a third-party during the time for appeal); (<u>see</u>
<u>also</u> Tr. 445:16-17 (Plaintiff conceding there is not an "exactly

12

factually analogous case").) Further, Barlean's position contradicts its own proposed jury instructions and verdict form, which included the question of mutual mistake despite the fact that Barlean's had already expressed its belief before trial that rescission would be ineffectual. (Doc. 48-1 at 22 (Barlean's proposed jury instruction); Doc. 48-2 at 2 (Barlean's proposed verdict form); Doc. 56 at 3-4 (Barlean's making similar argument pre-trial).)

The parties agree that North Carolina law applies in this case. And indeed, the equitable power of courts to fashion remedies upon a finding of mutual mistake of fact is amply supported by North Carolina law. See, e.g., Marriott Fin. Servs., Inc. v. Capitol Funds, Inc., 217 S.E.2d 551, 560 (N.C. 1975) ("It is a well-recognized principle that equity will grant relief from the consequences of mistake[.]"); see also infra (discussing rescission remedy). Barlean's conceded at trial that the issue of rescission is an equitable question for the court, not one for the jury. (See, e.g., Tr. 445:18-21 ("[T]he clear underlying concept with rescission is it should create an equitable result."); Tr. 670:8-12 (stating, after the verdict, "I would agree, Your Honor," to the statement by the court, "[T]here is still the equitable issue about [what] to do with the 500,000-dollar obligation.").)

Barlean's also argued that the waiver of defenses provisions in the guaranty agreement "make it so the guarantors essentially

13

cannot assert any defense." (Tr. at 441:23-443:22; Doc. 71 at 5 n.2.) The court granted this relief at trial. (Tr. 552:24-553:11.) Otherwise, Barlean's Rule 50 motion does not clearly argue for any other relief based on the waiver of defenses. At trial, Barlean's argued that rescission "should not be allowed" due to the waiver of defenses because "[i]t wouldn't be equitable, and it would be inconsistent with the contractual language that the Defendants voluntarily agreed to." (Tr. 443:8-12.) Presently, Barlean's discusses the waiver of defenses only in a footnote in its Rule 50 brief and states that "the Court should rule as a matter of law that the Guarantors are liable for all obligations of ACES arising from the loan — whether such obligations are legal or equitable." (Doc. 71 at 5 n.2.)

To be sure, Barlean's has never expressly argued that the nature of the guaranty agreement itself — i.e., a guaranty of payment with a waiver of defenses — requires, as a matter of contract law, that the Guarantors pay the obligation of the promissory note, notwithstanding the note's voidability. Fed. R. Civ. P. 50(a)(2); cf. Weisgram v. Marley Co., 528 U.S. 440, 454 (2000) (discussing the need for the party seeking to set aside verdict to put the opposing party "on notice" that the issue is challenged so that it can have the opportunity to oppose); (Doc. 74 (Defendants not discussing issue at all in response brief).)

In fact, Barlean's raised the waiver of defenses in the

14

guaranty agreement as a basis to hold the Guarantors liable only after the court inquired about it after trial had already begun. (Tr. 109:10-21 (Barlean's counsel responding to the court that waiver of defenses was "something that I have been focusing on more recently as we dived into things further" and conceding there was no pretrial motion on the issue); Doc. 13 (not arguing for enforcement of waiver of defenses on Rule 12(c) motion); Doc. 30 at 16-17 (arguing on summary judgment that Guarantors are liable but due to equitable principles, not due to waiver of defenses); Doc. 47 (not arguing in trial brief that waiver of defenses requires Guarantors to pay); Doc. 56 (not arguing in pre-trial brief on rescission that waiver of defenses requires Guarantors to pay); Tr. 670:4-671:22 (not mentioning waiver of defenses issue in response to court's request for briefing on how the jury's verdict "affects the guaranty agreement".)[5]

Consistent with its not expressly having argued this point, Barlean's has not cited any legal authority to support requiring that the Guarantors be held liable for the obligation arising under the promissory note even though the underlying contractual obligation is voidable based on mutual mistake. (Doc. 71 at 5 n.2 (citing only Am. First Fed., Inc. v. Zaria Props., LLC, No.

---

[5] While neither party objected to the court's reliance on the guaranty agreement's waiver of defenses to preclude the Guarantors from contending that they entered the guaranty agreement based on a mutual mistake, this issue is separate from whether the Guarantors should be held liable for the obligation arising under the voidable promissory note.

315CV404, 2017 WL 2662985, at \*3 (W.D.N.C. June 20, 2017) (enforcing guaranty with waiver of defenses where the underlying note <u>was</u> valid and enforceable)).) While Barlean's mentioned "inconsisten[cy] with the contractual language" at trial, it did not pair that conclusory argument with any reference to the language of the contract or with any argument that any inconsistency requires that the Guarantors be liable as a matter of contract law. (Tr. 443:10 (stating instead that rescission would be "inequitable").) By all accounts, the plain language of the guaranty agreement cabins the scope of the waiver of defenses to enforcement of the guaranty agreement itself, not to the promissory note. (PX 10 (". . . Guarantors expressly waive all legal and equitable defenses to the enforcement <u>of this Guaranty</u> . . . ." (emphasis added)); <u>see</u> <u>Ussery v. Branch Banking & Tr. Co.</u>, 777 S.E.2d 272, 280 (N.C. 2015) ("Waiver is the intentional relinquishment of a known right, and as such, knowledge of the right and an intent to waive it must be made plainly to appear." (internal quotation marks omitted)); <u>cf.</u> <u>Emerald Portfolio, LLC v. Outer Banks/Kinnakeet Assocs., LLC</u>, 790 S.E.2d 721, 725-26 (N.C. Ct. App. 2016) (enforcing guaranty of lost, unenforceable note where waiver of defenses expressly waived defenses "arising by reason of . . . the cessation of Borrower's liability from any cause whatsoever"). Absent any legal authority from Barlean's that would support requiring the Guarantors to pay at law, and

16

absent any request by Barlean's for the court to so order, the court declines to grant Rule 50 relief on this ground.[6]  In sum, Barlean's has not established that it is entitled to relief for the bases it argues under Rule 50.[7]

## B.    Post-Trial Remedies and Rescission

The court must now determine the appropriate equitable remedy — namely, whether a restitution judgment should be entered and, if so, against which Defendant(s).  Opsahl v. Pinehurst Inc., 344 S.E.2d 68, 72-74 (N.C. Ct. App. 1986) (citing Town of Nags Head v. Tillet, 336 S.E.2d 394, 398 (N.C. 1985)).  Barlean's complaint alleged breaches of two contracts: the promissory note and the guaranty agreement.  (Doc. 1 ¶¶ 26-37.)  Because the guaranty agreement includes an express waiver of "all legal and equitable defenses" to its enforcement, the jury was asked to consider — and did find — mutual mistake only as to the promissory note, which is the source of the $500,000 "obligation" that the Guarantors guaranteed.  (Doc. 66.)  In Barlean's view, ACES's alleged insolvency reduces the core dispute to whether judgment should be

---

[6] The court addresses below Barlean's contention that the waiver of defenses supports the equitable remedy it seeks.

[7] Barlean's also contends that ACES engaged in conduct that ratified the contract following discovery of the mutual mistake and did not tender return of the $500,000, which it contends should prevent rescission. (Doc. 71 at 3-4; Tr. 450:1-7.)  It appears, however, that Barlean's only raised the ratification argument in its post-trial brief; thus it is waived.  In any event, both the tender and ratification arguments fail for the reasons stated infra.

17

entered against the Guarantors or against ACES.

Barlean's principal position is that the court should enforce the promissory note, and thus the guaranty agreement, notwithstanding the jury's finding because it views ACES as unable to pay a restitution judgment. (Doc. 72 at 1-2.) Put another way, Barlean's contends that the court cannot rescind the promissory note entered into by mutual mistake because of the alleged insolvency of ACES. (Id. (requesting that court award the balance "under the [promissory note and guaranty], despite the jury's finding of a mutual mistake").) Barlean's requests in the alternative that, if the court rescinds the contract, it nevertheless enter a restitution judgment against the Guarantors, rather than against ACES, because it views ACES as unable to pay the restitution judgment. (Id. at 4.) Barlean's seeks $495,914.51 plus interest based on North Carolina's legal rate from the date of the loan, December 12, 2019, minus one dollar. (Doc. 72 at 3.) This figure is derived from the $500,000 loan principal, minus the credit ACES deducted on its one shipment ($4,085.49) and the one-dollar jury award for ACES's negligent misrepresentation claim. (Id.)

Defendants contend that the jury's verdict invalidates the contractual obligation of the promissory note, which renders the guaranty agreement essentially a moot instrument because it is premised on the "obligation . . . arising under the Note." (Doc.

18

73 at 15 ("[T]he result of the finding of mutual mistake as to the Promissory Note is that there is no Obligation left to guaranty.").) They accordingly ask the court to enter a judgment against ACES, but do not specify an amount. (Id. at 22.)

Under North Carolina law, "[a] contract may be avoided on the ground of mutual mistake of fact where the mistake is common to both parties and by reason of it each has done what neither intended." Marriott Fin. Servs. Inc., 217 S.E. 2d at 560; see also id. ("It is a well-recognized principle that equity will grant relief from the consequences of mistake[.]"); Lancaster v. Lancaster, 530 S.E.2d 82, 86 (N.C. Ct. App. 2000) ("It is well established that the existence of a mutual mistake as to a material fact comprising the essence of the agreement will provide grounds to rescind a contract."); Musselwhite v. Cheshire, 831 S.E.2d 367, 376 (N.C. Ct. App. 2019) ("[A] contract may be avoided on the ground of mutual mistake of fact[.]").[8]

Rescission should, as "a general rule," return the parties to the position they held before a contract was formed. Lumsden, 451 S.E.2d at 662. It is not, however, an absolute rule. Id. (collecting cases). "[I]f complete restoration to the status quo is impossible, the terms of a rescission remedy rest in the sound

---

[8] Some North Carolina courts have also reformed contracts entered into by mutual mistake of fact. See Herring v. Herring, 752 S.E.2d 190, 192 (N.C. Ct. App. 2013). No party has requested such a remedy here.

19

discretion of the courts." Id. (citing Williston on Contracts § 1460A, at 136 (3d ed. 1970)); Opsahl, 344 S.E.2d at 74 (discussing rescission cases). "It is a fundamental premise of equitable relief that equity regards as done that which in fairness and good conscience ought to be done." Thompson v. Soles, 263 S.E.2d 599, 603 (N.C. 1980).

Barlean's argument — that the court must enforce the promissory note notwithstanding the jury's finding of mutual mistake because ACES is allegedly insolvent — is not supported by North Carolina law. Even though Barlean's has pursued this theory throughout this litigation, Barlean's has never cited any authority that would support the proposition that a court must, or even can, enforce a contract that a jury found was entered into by mutual mistake of fact merely because the defendant is insolvent.

Barlean's cites two cases it contends supports this position: May v. Loomis, 52 S.E. 728 (N.C. 1905), and Lumsden v. Lawing, 451 S.E.2d 659 (N.C. Ct. App. 1995). Both are unavailing. In May, the buyer of timberland had cut and sold timber prior to seeking rescission on the ground that the land contained less timber than represented by the seller. May, 52 S.E. at 731. The North Carolina Supreme Court held that the buyer could not rescind the contract because it was "not now in a position to rescind the trade." Id. The court stated that some replacement for complete rescission was available, however, as it noted that the appropriate damages would

20

instead be "the difference between the value of the property sold as it was and as it would have been if it had come up with the representations." Id.

May is clearly distinguishable as one dealing with the sale of real property rather than a loan, and with non-fungible timber rather than money. See Marriott Fin. Servs., Inc., 217 S.E.2d at 562 ("Although this Court will readily grant equitable relief in the nature of reformation or rescission on grounds of mutual mistake when the circumstances justify such relief, we jealously guard the stability of real estate transactions and require clear and convincing proof to support the granting of this equitable relief in cases involving executed conveyances of land."). Even so, May actually supports the proposition that a contract entered into by mutual mistake should be rescinded and that a court has discretion to craft a remedy even where pure rescission cannot occur.

In Lumsden, the plaintiffs bought a home from defendants that was unsuitable for use as a single-family residence, which was as it was warranted. Lumsden, 451 S.E.2d at 660. The trial court awarded rescission and restitution, meaning that the defendants were ordered to return the money paid, and the plaintiffs were ordered to reconvey the property. Id. However, during the time for appeal, the property was foreclosed upon and sold to a third party. Id. The court held that the plaintiff was nevertheless

21

entitled to recover the balance awarded in restitution minus the value of the property.  Id. at 663.  Like May, then, Lumsden deals with non-fungible real property rather than loaned money, Marriott Fin. Servs., Inc., 217 S.E.2d at 562, and it likewise actually supports rescission upon the finding of mutual mistake even if a return to the status quo ante is not possible, Lumsden, 451 S.E.2d at 662 (describing status quo ante requirement as a general, not absolute rule).

In accord with North Carolina law, the promissory note is voided because it was entered into by mutual mistake.  The court thus turns to determining what restitution remedy is appropriate and, more specifically, whether, as Barlean's contends, equity demands a judgment against the Guarantors, rather than ACES, which is the maker of the avoided promissory note.  In doing so, the court will consider the arguments raised by the parties as to ACES's ability to pay, the guaranty's waiver of defenses, the evidence at trial, and ratification and tender of consideration.

### 1. Ability to Pay

Barlean's first advocates for a restitution judgment against the Guarantors, rather than ACES, because it views ACES as unable to pay.  (Doc. 72 at 2.)  Barlean's relies on May and Lumsden for this proposition as well.  (Id.)  However, the same distinguishing features discussed above apply to this contention.  Moreover, neither of those cases speaks at all to the issue of whether the

22

owners of a corporate entity must individually pay a rescission judgment for a contract that was executed by the entity and voided by an affirmative defense.

By framing ACES's status as "defunct," "judgment-proof," and "unable to pay" in service of its equity argument, Barlean's misapprehends North Carolina's policy toward limited liability companies. In effect, Barlean's asks the court to bypass ACES's corporate form and reach the pockets of its members in the name of equity. But piercing the corporate veil is allowed only in narrow circumstances "to achieve equity." Glenn v. Wagner, 329 S.E.2d 326, 330 (N.C. 1985). There has been no allegation that these circumstances exist here. Allred v. Exceptional Landscapes, Inc., 743 S.E.2d 48, 54 (N.C. Ct. App. 2013) (listing "inadequate capitalization, non-compliance with corporate formalities, complete domination and control of the corporation so that it had no independent identity, and excessive fragmentation of a single enterprise into separate corporations" as the scenarios where piercing the corporate veil may be an equitable remedy).

Barlean's request appears even more extraordinary in light of the fact that North Carolina law expressly contemplates claims against dissolved limited liability companies. N.C. Gen. Stat. §§ 57D-6-10 through 57D-6-13. These statutes do not, however, reveal an intent by the General Assembly to allow courts to enter a judgment against an LLC's members merely because the LLC is

23

unable to pay it.  In fact, the law limits, but allows, reaching the personal funds of a dissolved LLC's members when a judgment is entered against a dissolved LLC.  N.C. Gen. Stat. § 57D-6-12(a) (permitting claims "in proportion to but not in excess of the distributions, if any, made to each interest owner following the LLC's dissolution").  The law does not, however, contemplate allowing a judgment directly against the members for an obligation of the dissolved LLC.[9]

   To the extent Barlean's views this limitation on liability and any associated difficulties in pursuing collection to be inequitable, such is the risk of doing business with an LLC — a fact known to Barlean's, which is itself an LLC.  See N.C. Gen. Stat. § 57D-3-30 ("A person who is an interest owner . . . is not liable for the obligations of the LLC solely by reason of being an interest owner[.]"); Restatement (3d) of Restitution and Unjust Enrichment § 54(3)(b) (Mar. 2024 update) (considering assignment of risk in fashioning restitution award); S. Shores Realty Servs., Inc. v. Miller, 796 S.E.2d 340, 354 (N.C. Ct. App. 2017) (rejecting attempt by party to upset General Assembly's policy choices with respect to limited liability companies).  It is also notable that,

_____

[9] Further, Barlean's has submitted no evidence to contradict Defendants' representation that Dick, Sartin, and Poindexter received no distributions upon dissolution but in fact contributed additional personal funds in the LLC's winding up.  (Doc. 46 at 3-4 ("ACES did not make any distributions to the members of the LLC in connection with the dissolution and '[i]f anything, its members have come out of pocket to take care of some things.'").)

24

to the extent Barlean's relies on ACES's current failed financial position, Barlean's waited two years after ACES's last payment on the promissory note and two months after ACES announced its dissolution before seeking recovery of these funds. (Doc. 1 ¶ 25 (admitted by Defendants, Doc. 7); Doc. 1-10 (demanding payment April 19, 2022).)

In sum, the court declines to accept Barlean's argument that the inability of an LLC to pay a judgment should, as an equitable matter, require that its members be personally liable.

### 2. Waiver of Defenses

Barlean's also contends that the waiver of defenses provision in the guaranty agreement would render it inequitable to let the Guarantors "off the hook." (Tr. at 441:23-443:22.) Barlean's argues in its post-trial brief that the waiver of defenses creates an "equitable obligation" to pay rescission on the promissory note because the obligations extend to those "arising under the Note." (Doc. 72 at 4 (quoting PX 10).)

Importantly, as discussed above in connection with its Rule 50 motion, Barlean's has never argued that the waiver of defenses requires that the Guarantors pay the obligation of the note as a matter of contract law, notwithstanding the voidability of the promissory note. Barlean's first addressed the waiver of defenses as an issue only after the court inquired as to the effect of the provision after trial was already underway. (Tr. 109:13-21

25

(Barlean's counsel explaining delay in raising issue); Doc. 13 (not argued on Rule 12(c) motion); Doc. 30 at 16-17 (not argued on summary judgment); Doc. 47 (not argued in trial brief); Doc. 56 (not argued in pre-trial brief on rescission); Tr. 670:4-671:22 (not advocating that the issue be briefed post-trial).) And Barlean's first argued that the waiver of defenses requires the Guarantors to pay as a matter of equity in its Rule 50 motion at trial which, as already discussed, the court addressed. (Tr. 443:4-12.)

Barlean's raises this contract interpretation argument for the first time in its post-trial brief — i.e., well beyond when Defendants could have litigated the issue. Cf. Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co. of N. Carolina, 508 F. App'x 243, 253 (4th Cir. 2013) (unpublished) (reversing district court that considered argument raised for the first time after trial because opposing party could have marshaled evidence in opposition and prejudice was therefore "obvious").[10] Indeed, Defendants have not even had the opportunity to respond to Barlean's position because it was raised at the last possible point. Not to mention that Barlean's argument raises potential fact questions regarding the intent of the parties. See

---

[10] Unpublished opinions of the Fourth Circuit are not precedential but can be cited for their persuasive, but not controlling, authority. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

26

_Weyerhaeuser Co. v. Carolina Power & Light Co._, 127 S.E.2d 539, 541 (N.C. 1962) ("The controlling purpose of the court in construing a contract is to ascertain the intention of the parties as of the time the contract was made.").

Furthermore, Barlean's has offered no legal or evidentiary basis for its dubious reading of the contract, and it has not cited any authority for the proposition that the court is permitted to extend the guaranty agreement's waiver of defenses to an equitable remedy related to the promissory note, even though it is void. (Doc. 72 at 4 (citing only _Am. First Fed., Inc._, 2017 WL 2662985, at *3 (enforcing guaranty with waiver of defenses where the underlying note was valid and enforceable))). A waiver is "the intentional relinquishment of a known right, and as such, knowledge of the right and an intent to waive it must be made plainly to appear." _Ussery_, 777 S.E.2d at 280 (internal quotation marks omitted). Under North Carolina law, "the obligation of the guarantor and that of the maker, while often coextensive are, nonetheless, separate and distinct." _EAC Credit Corp. v. Wilson_, 183 S.E.2d 859, 862 (N.C. Ct. App. 1971), _aff'd_, 187 S.E.2d 752 (N.C. 1972); _see also_ Restatement (3d) of Suretyship & Guaranty § 37 (Mar. 2024 update) (providing that if creditor takes any act that impairs the principal obligor's duty of performance, the secondary obligor is discharged from its duties); _id._ § 48 (recognizing the enforceability of waiver of defenses clauses "by

27

specific language" in the contract).

Critically, while Barlean's has not argued for this contract interpretation until now, nowhere does the guaranty state that the Guarantors undertook to pay an equitable remedy of the debtor. Instead, the guaranty agreement covers the "obligations of the Debtor," and the "obligations" that are guaranteed are "all obligations of the Debtor to the Lender <u>arising under the Note</u>." (PX 10 at 1 (emphasis added)); <u>see Carolina Place Joint Venture v. Flamers Charburgers, Inc.</u>, 551 S.E.2d 569, 571 (N.C. Ct. App. 2001) ("A guarantor's liability depends on the terms of the contract as construed by the general rules of contract construction."). Here, the promissory note is voided for mutual mistake, and as addressed and rejected, <u>supra</u>, Barlean's contention that there still exists an obligation "arising under the Note" is entirely without merit. Moreover, the guaranty agreement expressly cabins the scope of the waiver of defenses to the enforceability of the guaranty agreement itself, not to the enforceability of the promissory note. (PX 10 at 2 (". . . Guarantors expressly waive all legal and equitable defenses to the enforcement <u>of this Guaranty</u> . . . ." (emphasis added)); <u>cf. Emerald Portfolio, LLC</u>, 790 S.E.2d at 725-26 (enforcing guaranty of lost, unenforceable note as a matter of contract law where waiver of defenses expressly waived defenses "arising by reason of . . . the cessation of Borrower's liability from any cause whatsoever").

28

At its core, Barlean's position on the waiver of defenses fashions a legal contract argument as an equity argument. But absent any legal or factual support for its reading of the contract, Barlean's has not shown that the waiver of defenses supports the equitable remedy it seeks, either. That is because "[e]quity follows the law." Graf v. Hope Bldg. Corp., 254 N.Y. 1, 9 (1930) (Cardozo, J., dissenting).

### 3. Evidence at Trial

The evidence at trial further supports that a judgment against ACES in equity is what "in fairness and good conscience ought to be done." Thompson, 263 S.E.2d at 603. The trial evidence established that in 2019, members of ACES saw the CBD industry as a profitable market and had begun shopping around for financing. (Tr. 210:15-23; PX 1.) In early 2019, ACES contacted Barlean's about establishing a business relationship whereby ACES would supply Barlean's with CBD oil. (Tr. 346:22-347:2.) Barlean's then-CEO Puckett met with representatives of ACES in North Carolina in the fall of 2019 to discuss the details of this arrangement. (Tr. 342:5-16.) Poindexter testified at trial that, in the course of these discussions, Puckett represented to ACES that Barlean's current business required at least 200 liters of "crude"[11] CBD oil

---

[11] The parties elicited testimony at trial about the various types of CBD oil and nomenclature in the industry through lay witnesses. There was some testimony that "full spectrum" CBD oil is a type of "crude" oil, which is a highly viscous liquid. (Tr. 256:18-257:8, Tr. 486:2-7, Tr.

per month. (Tr. 378:14-22.) Poindexter also testified that the ACES team asked Puckett "every which way from sundown" what volume and oil type Barlean's required of its supplier and each time Puckett confirmed the volume and type. (Tr. 401:6-13; see also DX 8 (ACES describing in an October 9, 2019 email summary of meeting with Puckett that Puckett "puts crude into every product line").) Puckett testified that he did not remember the exact volumes discussed but stated that there "was definitely conversation surrounding our current demands." (Tr. 341:23-342:4, 354:2-355:2.)

Puckett indicated that, to become a supplier of CBD oil for Barlean's, ACES would need to upfit a new facility to comply with the FDA's cGMP requirements. (Tr. 468:2-10.) Barlean's owner, Bruce Barlean, "donated" Puckett to personally oversee the upfit in North Carolina for several months. (Tr. 106:20-23.) To finance this upfit, Barlean's and ACES executed a $500,000 promissory note on December 12, 2019. (PX 9.) The note was guaranteed that same day by the Guarantors. (PX 10.) ACES's CEO Kunberger wrote to his team that this loan was critical to get ACES "out of the ditch." (PX 3.)

---

516:13-15.) Witnesses testified that crude oil must be diluted with a "carrier oil" such as medium-chain triglycerides ("MCT oil") to reduce the percentage of tetrahydrocannabinol ("THC") to permit shipment in interstate commerce. (Tr. 254:10-255:8.) There was also some testimony that a more finished CBD product may be referred to as a "distillate." (Tr. 256:2-8, Tr. 397:1-3, Tr. 534:18-535:15.)

30

Shortly thereafter, Peter Nguyen, a research and development director for Barlean's, engaged with ACES regarding the product ACES would supply. Consistent with Defendants' contentions, on December 23, 2019, Nguyen described the product as "CBD Crude Oil" which was to be "dilute[d] . . . into 5.4% concentration with [medium-chain triglyceride] oil before you ship." (DX 1.) Then on January 27, 2020, ACES's employee Charles Dick[12] emailed a call summary following a phone call with Nguyen, where he described the use of terpenes[13] "for [Barlean's] crude oil blend." (DX 11.) In response, Nguyen responded, "This is perfect. You sum up everything that I would like to communicate with you." (Id.)[14]

Two days later, and following an exchange of previous drafts, Barlean's and ACES entered into a "Memo of Understanding" on January 29, 2020. (PX 14.) The agreement contained terms for ACES to repay the promissory note with a discount to Barlean's of five percent on each purchase order of CBD oil. (Id.) The agreement provided that ACES would supply Barlean's with "full-spectrum CBD oil (diluted) containing less than 0.3% THC and 5.4%

---

[12] Charles Dick is not the same person as Defendant Arthur Dick, also known as Charles Arthur Dick.

[13] Charles Dick described terpenes as "the natural flavoring from the plant" that act as "the plants' defensive mechanism against pests." (Tr. 283:12-17.)

[14] Charles Dick also testified that he had sent a crude oil blend to Barlean's in August 2019 and that Nguyen indicated to him that the sample "looked great." (Tr. 260:24-262:11; DX 5.)

CBD to finished specification necessary to the marketplace at the agreed price of $1800 FOB/kilo." (Id.) At a volume of 200 liters per month, ACES would have paid off the loan in three years. (Tr. 191:3-6.)

In February 2020, representatives of the parties met at Barlean's office in Washington State. (Tr. 452:7-10.) By this date, the upfit overseen by Puckett was complete, the proceeds of the loan had largely, if not entirely, been spent, and ACES had entered into a lease at a cost of over $13,000 per month. (Tr. 200:12-19 ("[The facility] was built. It was [] time to eat."); Tr. 195:9-16 (describing rent as "astronomical"); DX 17.) Kunberger and Puckett both testified that the parties learned at this meeting for the first time that Barlean's was not receiving 200 liters per month of CBD oil from its current supplier, as it had told Defendants, but rather only 23 liters. (Tr. 201:8-20, Tr. 360:9-361:19.) Kunberger testified that, in response, Bruce Barlean asked Puckett, "How did you not know that?" and asked Kunberger, "[I]f you were me, would you have done this deal?" (Tr. 201:21-202:1.) Kunberger responded that he would not have, and that ACES, too, would never have taken the deal based on the lower volumes because doing so would have required 25 years to repay the loan. (Tr. 202:1-5.) Bruce Barlean refuted at trial that the exchange occurred as ACES claims but also admitted that he was not present for Puckett's alleged misrepresentations in North

32

Carolina. (Tr. 101:22-24, Tr. 452:7-453:12.) Bruce Barlean did acknowledge at trial that he "doubt[s]" that he would have been comfortable entering into the promissory note based on the lower volume. (Tr. 135:2-19.)

Following the February 2020 meeting and with the promissory note funds already spent on the complete upfit, the parties attempted to make the business arrangement work — but to little avail. (Tr. 207:16-21, Tr. 244:18-22.) ACES sent its first shipment of CBD oil to Barlean's in April 2020, which Barlean's critiqued as having a "very distinct bitter flavor" (PX 20) and sent back. In July 2020, after Barlean's terminated Nguyen's employment (apparently for unrelated reasons), Megan Beason, a quality manager at Barlean's, indicated that it was receiving a CBD oil product from its current supplier that only requires Barlean's to bottle it. (DX 13.) In an e-mail summary of a call between Beason and ACES, Charles Dick stated that it was "currently undefined as to whether [Barlean's] current supplier is solely using raw full spectrum crude and/or further refined full spectrum extracts" but that both sides agreed that "they may be using more than one type of full spectrum extract in their blend." (DX 15.) Beason did not contest this characterization in her response. (Id.) Charles Dick wrote in a separate e-mail summary of the same call, addressed to the ACES team, that "[Nguyen] le[d] both ACES and Barlean[']s in the wrong direction[]" as to the type of CBD

33

oil ACES would provide. (DX 14; Tr. 301:3-11 (Charles Dick testifying that Beason had made this representation about what Nguyen had done); see also Tr. 104:2-4 (Bruce Barlean stating that he "had no idea" in 2019 what the current supplier was providing).) Barlean's offered no evidence to contradict Charles Dick's summaries.

ACES requested information from Barlean's regarding what its current supplier was producing to meet Barlean's current needs, but Barlean's was limited to sharing a "specification" because, it then learned, the precise recipe was proprietary to the supplier. (PX 18; Tr. 206:16-25; see also Tr. 392:9-15 (Poindexter stating that ACES "[a]bsolutely" would not have entered the deal if he knew ACES would have to recreate a proprietary blend).) Puckett admitted that in October 2019, he did not understand the term "distillate," which Barlean's required, to mean a product different from a crude oil diluted with MCT oil. (Tr. 330:25-333:25.) He only later learned that he had largely conflated the two. (Id.) However, Nguyen testified that Barlean's was seeking crude oil notwithstanding what its current supplier was producing. (Tr. 522:11-22.)

In the end, ACES sent just the one April 2020 shipment to Barlean's. For this shipment, ACES credited Barlean's five percent of the purchase price — i.e., $4,085.49 of $81,709.80 — as an apparent repayment of loan pursuant to the "Memo of Understanding."

34

(PX 21.)  Despite some efforts to revive the arrangement over the intervening months, essentially nothing came of it, due in part to the fact that the CBD market had imploded.  (PX 22 through 25.)

The above evidence demonstrates that Barlean's was the source of every material mistake between the parties and was at all times in the best, if not the only, position to know the falsity of its mistaken statements.  Further, the jury's finding that Barlean's was liable for negligent misrepresentation for the same representations underlying the mutual mistake defense supports the conclusion that Barlean's bears primary responsibility.  (Tr. 617:1-5 (Defendants arguing that the alleged misrepresentations were the same as the mistakes underlying its mutual mistake defense); Doc. 64 (instructing on negligent misrepresentation that the jury must determine whether Barlean's supplied false information, that Barlean's failed to exercise reasonable care, and that ACES's reliance was justifiable).)

#### 4.  Ratification and Tender of Consideration

Barlean's raises two remaining arguments in an effort to preclude the mutual mistake from avoiding the promissory note and to seek a judgment against the Guarantors: that Defendants took steps that ratified the contract, and that Defendants never tendered consideration.  (Doc. 71 at 2; Doc. 72 at 3 n.1.)

As to ratification, Barlean's contends that Defendants' continued efforts to do business with Barlean's after discovering

the mistake amounts to ratification of the contract. (Doc. 71 at 3.) Barlean's cites May for the proposition that if "the injured party voluntarily does some act in recognition of the contract, his power to rescind is then at an end." May, 52 S.E. at 731. Closer review of May, however, shows that Barlean's overreads this principle, as the North Carolina Supreme Court's observation was in a context where the injured party's ratifying steps made complete rescission impossible. Id. (noting, instead, that money damages could be available in lieu of non-fungible consideration).[15] For several reasons, it would make little sense to apply this principle here. Importantly, Barlean's did not request a jury instruction as to ratification. (Doc. 48-1); Hassett v. Dixie Furniture Co., 425 S.E.2d 683, 687 (N.C. 1993) (discussing ratification as question of fact for the jury); N.C. Pattern Instruction 501.30 (not including ratification as a relevant consideration).[16] By the time the parties realized Barlean's misstatements and the mutual mistake, moreover, the upfit was complete and ACES had contributed an additional

---

[15] There is no current guidance on May's applicability, as this case has been cited only once in the last fifty years for this proposition. See Hous., Inc. v. Weaver, 246 S.E.2d 219, 227-28 (N.C. Ct. App. 1978) (applying principle to a plaintiff who waited to sue, not a defendant seeking to avoid a contract), aff'd, 296 N.C. 581, 251 S.E.2d 457 (1979).

[16] Barlean's did request a "defense of waiver" instruction for the negligent misrepresentation claim, which would appear to rest upon similar facts. (Doc. 48-1 at 31.) In any event, it would not affect the contract claim.

36

$124,450.89 to the upfit. Barlean's presented no evidence that ACES could have salvaged the loan amount, or that the roughly $25,200 in proceeds of physical capital sold by ACES in its dissolution flowed to the Guarantors. (Tr. 394:12-395:2; PX 28.)[17] Rather, their efforts to continue doing business with Barlean's would have actually enabled them to repay the loan. Applying the ratification principle to the present facts would create a disincentive for defendants to reconcile mutual mistakes outside of court, before a costly lawsuit begins, for fear that their actions would preclude future defenses to liability. See Honeycutt v. Honeycutt, 701 S.E.2d 689, 695-97 (N.C. Ct. App. 2010) (discussing ratification in a case where a plaintiff sought rescission after electing to perform, not where a defendant sought rescission through affirmative defense); Hous., Inc. v. Weaver, 246 S.E.2d 219, 228 (N.C. Ct. App. 1978) (same), aff'd, 251 S.E.2d 457 (N.C. 1979).[18]

As to failure to tender consideration, Barlean's argues that

---

[17] Barlean's has never sought these proceeds in this case, for example, on a conversion theory.

[18] North Carolina courts have enforced some form of a ratification rule to prevent strategic plaintiffs from discovering a mutual mistake and affirmatively seeking rescission at a time most convenient for them and potentially detrimental to their counterpart. See Hutchins v. Davis, 52 S.E.2d 210, 213-14 (N.C. 1949) (stating that a plaintiff seeking to void a contract must either affirm or repudiate it; he cannot "blow both hot and cold"). It makes little sense, however, to extend this rationale to Defendants, who, by definition, reactively raised mutual mistake as a defense after Barlean's filed suit alleging breach of contract.

37

Defendants cannot rescind because they never offered to repay the loan. (Doc. 71 at 2-3.) Similarly on this point, Barlean's authority in support, Spector Industries, Inc. v. Mitchell, 305 S.E.2d 738 (N.C. Ct. App 1983), is unavailing. While the court there did mention that the defendant had "not tendered return" of money and "is therefore unable to restore the status quo," the court expressly affirmed a summary judgment finding of no mutual mistake as to the formation of the contract. Id. at 742. Barlean's has not cited any support for applying this rule to a defendant who successfully raises an affirmative defense to avoid a contract, and it would likewise be inequitable to apply this rule here. See N.C. Pattern Instruction 501.30 (not including tender as a relevant consideration for mutual mistake). For obvious reasons, requiring ACES to tender repayment of the loan in order to avail itself of the mutual mistake defense and rescission — when, at the time the parties discovered the mistake, the funds had already been spent — would require Defendants to tender return of the exact relief Barlean's has sought in this case and permit Barlean's to benefit from its own misstatements.

In sum, after considering ACES's alleged inability to pay, the guaranty's waiver of defenses, the evidence at trial, and Barlean's contentions regarding ratification and tender, the court finds that the equities clearly favor entry of judgment against ACES, rather than against the Guarantors.

### C.  Monetary Awards and Interest

Having resolved these issues, the court turns to the entry of judgment and determination of any interest.  State law governs the award of prejudgment interest in a diversity case.  Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 633 (4th Cir. 1999).  Federal law governs the same for postjudgment interest.  Forest Sales Corp. v. Bedingfield, 881 F.2d 111, 113 (4th Cir. 1989).

Barlean's has requested that court apply North Carolina General Statute § 24-5 and award interest from the date of the loan for the restitution award.  This provision states:

> (a) In an action for breach of contract, except an action on a penal bond, the amount awarded on the contract bears interest from the date of breach.
> . . .
> (b) In an action other than contract, any portion of a money judgment designated by the fact finder as compensatory damages bears interest from the date the action is commenced until the judgment is satisfied. Any other portion of a money judgment in an action other than contract, except the costs, bears interest from the date of entry of judgment under G.S. 1A-1, Rule 58, until the judgment is satisfied. Interest on an award in an action other than contract shall be at the legal rate.

N.C. Gen. Stat. § 24-5.  But Barlean's request is inconsistent with the statute.  While the action began as one for breach of contract, the jury's verdict has voided the promissory note.  Accordingly, the award fits within subsection (b).  See Med. Mut. Ins. Co. v. Mauldin, 577 S.E.2d 680, 682-83 (N.C. Ct. App. 2003) (awarding interest for restitution award under § 24-5(b)); Farmah v. Farmah, 500 S.E.2d 662, 663 (N.C. 1998) (same for quasi-contract

39

case).  Further, "equitable remedies which require the payment of money do not constitute compensatory damages as set forth in N.C. Gen. Stat. § 24-5(b)."  Mauldin, 577 S.E.2d at 682.

Accordingly, only postjudgment interest is available for the restitution award.  Thus, judgment will be entered against ACES in the amount of $495,914.51, with interest to run at the federal rate pursuant to 28 U.S.C. § 1961(a).[19]  The court will award ACES $1.13 for Barlean's negligent misrepresentation, to include pre-judgment interest, plus post-judgment interest to accrue at the federal rate.  N.C. Gen. Stat. §§ 24-1, 24-5(b); 28 U.S.C. § 1961(a).  Because the judgment against ACES arises in equity and not under the promissory note, and for the reasons noted above, the Guarantors are not liable for the award against ACES.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Barlean's motion pursuant to Federal Rule of Civil Procedure 50 is DENIED.  A judgment in accordance with this order will follow.

---

[19] In a footnote, Barlean's states that the court "could potentially consider[]" other "issues," such as the value of the upfit, the proceeds of the sale of equipment that Barlean's gifted to ACES, and the "substantial delay" in asserting the mutual mistake defense.  (Doc. 72 at 3 n.1.)  Barlean's has never sought this remedy before this post-trial brief, and these issues have not been litigated.  It also concedes in the same footnote that its calculation is "an efficient and straightforward solution."  (Id.)  The court thus declines Barlean's suggestion.

40

/s/   Thomas D. Schroeder
                                    United States District Judge
May 23, 2024